1  BILL LOCKYER
   Attorney General of the State of California
2  CHRISTOPHER M. AMES
   Senior Assistant Attorney General
3  PAULINE GEE (SBN 74447)
   Deputy Attorney General
4  RANDY BARROW (SBN 111290)
   Deputy Attorney General
5  ANTHONY M. BOVA (SBN 158245)
   Deputy Attorney General
6  1300 I Street, P.O. Box 944255
   Sacramento, CA 94244-2550
7  Telephone: (916) 322-1642
   Facsimile: (916) 323-6882
8
   SHARTSIS, FRIESE & GINSBURG LLP
9  ARTHUR J. SHARTSIS (SBN 51549)
   MARY JO SHARTSIS (SBN 55194)
10 CHARLES R. RICE (SBN 98218)
   One Maritime Plaza, 18th Floor
11 San Francisco, California 94111
   Telephone: (415) 421-6500
12 Facsimile: (415) 421-2922

13 Attorneys for Plaintiff
   STATE OF CALIFORNIA

14            UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16                  WESTERN DIVISION

17

18 STATE OF CALIFORNIA, *ex rel.* RoNo, )   Case No. CV-01-8587 AHM (CWx)
   LLC,                                  )
19                        Plaintiff,     )   **FIRST AMENDED COMPLAINT**
                                         )   **FOR VIOLATION OF THE**
      v.                                 )   **CALIFORNIA FALSE CLAIMS**
20                                       )   **ACT, UNFAIR COMPETITION,**
   ALTUS FINANCE S.A.; APOLLO            )   **CIVIL RICO, AND ACCOUNTING**
21 ADVISORS, L.P.; ARTEMIS S.A.;         )
   ARTEMIS FINANCE S.N.C.; ARTEMIS       )   **Gov. Code §§ 12650** *et seq.*
22 AMERICA PARTNERSHIP; AURORA           )   **Bus. & Prof. Code §§ 17200** *et seq.*
   S.A.; AURORA NATIONAL LIFE            )   **18 U.S.C. §§ 1961** *et seq.*
23 ASSURANCE COMPANY; LEON D.            )
   BLACK; CRAIG M. COGUT; CDR            )   **DEMAND FOR JURY TRIAL**
24 ENTERPRISES; CDR CREANCES;            )
   CONSORTIUM DE REALISATION             )   Trial Date:      None set
25 S.A.; CREDIT LYONNAIS S.A.,           )
   CREDIT LYONNAIS U.S.A.; CREDIT        )   Complaint In Intervention Filed:
26 LYONNAIS SECURITIES, INC.; JOHN       )   June 19, 2001
   J. HANNAN; JEAN-FRANCOIS              )
27 HENIN; LION ADVISORS, L.P.;           )   Original Complaint Filed:
   *(continued)*                         )   February 17, 1999
28

Case  No.  CV-01-8587                    FIRST AMENDED COMPLAINT
(AHM) (CWx)                              DEMAND FOR JURY TRIAL

CLERK, U.S DISTRICT COURT
FILED
JAN 30 2002
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

JAN 31 2002

1 | MAAF ASSURANCES; MAAF VIE )
S.A.; NEW CALIFORNIA LIFE )
2 | HOLDINGS, INC.; OMNIUM GENEVE )
S.A.; PEGASUS INSURANCE )
3 | PARTNERS, L.L.P; FRANCOIS )
PINAULT; and ERIC B. SIEGEL )
4 | )
)
Defendants. )

The Attorney General, acting on behalf of the State of California (the "State"), prosecutes this action pursuant to the powers vested in him by Article V, section 13, of the California Constitution, section 12652 of the California Government Code and section 17204 of the California Business and Professions Code. Based on the Attorney General's investigation of the matters described herein, the State alleges as follows:

## INTRODUCTION

1. In 1991, Executive Life Insurance Company ("ELIC") was one of California's largest insurers, with approximately 300,000 policyholders and billions of dollars of assets, a large portion of which consisted of high yield "junk" bonds. ELIC had close ties to Michael Milken. In the aftermath of the criminal proceedings against Michael Milken and the resulting impact on the junk bond market, in 1991 ELIC became imperiled when large numbers of policyholders cashed out their policies. On April 11, 1991, the Commissioner of Insurance for the State of California ("Commissioner"), acting in his official capacity on behalf of the State, seized all of ELIC's business and property by order of the California Superior Court, and title to all of ELIC's assets vested in the Commissioner as an officer of the State on that date.

2. In violation of California law, which prohibits foreign governments from owning or controlling a California insurance company, Credit Lyonnais, a French bank owned principally by the government of France, acting through its investment subsidiary, Altus Finance S.A. ("Altus"), in partnership with Apollo Advisors, L.P. and former associates of Michael Milken, used a group of French

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1   companies as phony "fronts" to acquire from the State the ELIC insurance business

2   and certain junk bonds selected by Apollo. After successfully using phony fronts to

3   enable Credit Lyonnais through Altus to acquire these assets illegally, the defendants

4   conspired to resell the insurance business and bond portfolio to Artemis S.A.

5   ("Artemis"), a company owned by Francois Pinault, a prominent and wealthy French

6   businessman with close ties to Credit Lyonnais. Using a back-dated and falsified

7   agreement, Altus sold Artemis the insurance business, and Apollo orchestrated the

8   timing of formal transfers of ownership from the phony fronts to Artemis in order to

9   avoid public scrutiny. In violation of state and federal law, Artemis concealed its

10  knowledge of the false ownership by the fronts and the actual ownership of the

11  insurance business by Altus and Credit Lyonnais. The means by which the

12  defendants carried out their unlawful purposes and the facts that give rise to this

13  action are alleged more fully below.

## JURISDICTION

15  3.      This action was filed on February 17, 1999, in the Superior Court of the

16  State of California for the County of San Francisco, Case No. 301344, by a

17  whistleblower as a *qui tam* plaintiff pursuant to the California False Claims Act,

18  Government Code section 12652(c)(1). Following an extensive investigation of the

19  facts and circumstances disclosed by the whistleblower, the Attorney General

20  intervened in this action pursuant to section 12652(c)(6)(A) of the Government Code

21  on June 19, 2001. The action was removed to federal court and then transferred to

22  this Court, pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1441(d), by defendant

23  Credit Lyonnais S.A., claiming that the action is against a foreign state within the

24  meaning of 28 U.S.C. § 1603(b). This Court also has jurisdiction and venue of this

25  action pursuant to the Racketeer Influenced and Corrupt Organizations Act

26  ("RICO"), 18 U.S.C. §§ 1964 and 1965.

## PARTIES

28  4.      The Attorney General (the "State") has assumed control of this action

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-2-

1   from *qui tam* plaintiff RoNo, LLC ("RoNo") and is prosecuting it on behalf of the

2   State of California. RoNo commenced the action as a *qui tam* plaintiff under the

3   California False Claims Act, Government Code section 12652(c)(1) (the "FCA").

4   5.   Defendant Altus Finance S.A ("Altus") is a corporation organized under

5   French law. Altus is the predecessor in interest of defendant CDR Enterprises. At

6   all relevant times, Altus was owned and controlled by defendant Credit Lyonnais and

7   acted on its behalf or as its agent.

8   6.   Defendant Jean-Francois Henin ("Henin") was at all relevant times the

9   chief executive officer of Altus.

10   7.   Defendant Credit Lyonnais S.A. is a banking corporation organized

11   under French law and, at all relevant times, was doing banking business in California

12   ("Credit Lyonnais"). The majority owner of Credit Lyonnais was, at all relevant

13   times, the government of France. The term "Credit Lyonnais" includes defendants

14   Credit Lyonnais U.S.A. and Credit Lyonnais Securities, Inc., which are subsidiaries

15   of Credit Lyonnais organized under American law and doing business in California.

16   8.   Defendant CDR Creances was a banking subsidiary of Altus, and was

17   formerly known as SBT–BATIF.

18   9.   Defendant CDR Enterprises is a corporation organized under French

19   law and is wholly owned by defendant Consortium de Realisation S.A.

20   10.   Defendant Consortium de Realisation S.A. is a corporation organized

21   under French law. Defendants CDR Enterprises, CDR Creances and Consortium De

22   Realisation S.A. (collectively, "CDR") are responsible as successors in interest for

23   all debts and liabilities of Altus, Credit Lyonnais and SBT Batif arising from the acts

24   alleged in this Complaint.

25   11.   Defendant Apollo Advisors, L.P. ("Apollo Advisors") is a limited

26   partnership organized and registered in the State of Delaware and doing business in

27   California.

28   12.   Defendants Leon D. Black ("Black"), John J. Hannan ("Hannan"),

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-3-

1  Craig M. Cogut ("Cogut") and Eric B. Siegel ("Siegel") are, or were at all relevant
2  times, principals in "Apollo," as defined below. Cogut and Siegel are, or were at all
3  relevant times, principals in Pegasus, as defined below.

4      13.    Defendant Lion Advisors, L.P. ("Lion Advisors") is a limited
5  partnership organized and registered in the State of Delaware and doing business in
6  California.

7      14.    "Apollo" means Apollo Advisors, Lion Advisors, Black, Hannan,
8  Cogut, Siegel and the various funds, accounts and business entities controlled by
9  Black and his associates that entered into relationships with the other defendants to
10 engage in the activities described in this Complaint.

11     15.    Defendant Pegasus Insurance Partners ("Pegasus") is a partnership
12 organized under Connecticut law and doing business in California. Pegasus was
13 formed by some of the Apollo principals to receive a share of the profits from the
14 illegal activities described in this Complaint.

15     16.    Defendant MAAF Assurances ("MAAF") is a mutual insurance
16 company organized under French law, sometimes known as La Société Mutuelle
17 Assurance Artisanale De France, that was doing business in California at all relevant
18 times.

19     17.    Defendant MAAF Vie S.A. ("MAAF Vie") is a stock life insurance
20 company organized under French law, sometimes known as La Société Mutuelle
21 Assurance Artisanale De France Vie S.A. MAAF Vie is wholly owned by defendant
22 MAAF and was doing business in California at all relevant times.

23     18.    Jean-Claude Seys ("Seys") was, at all relevant times, an officer of
24 MAAF and MAAF Vie responsible for their general management.

25     19.    Jean Irigoin ("Irigoin") was, at all relevant times, an officer and/or
26 director of MAAF and MAAF Vie.

27     20.    Defendant Omnium Geneve S.A. ("Omnium Geneve") is a holding
28 company organized under Swiss law that was, at all relevant times, doing business in

-4-

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

California.

21.     Defendant Artemis S.A. ("Artemis") is a corporation organized under French law that does business in California. At all relevant times, Artemis was owned in part by defendants Credit Lyonnais and Francois Pinault.

22.     Defendant Artemis Finance S.N.C. ("Artemis Finance") is an entity organized under French law and doing business in France and California. At all relevant times, Artemis was the majority owner of defendant Artemis Finance.

23.     Defendant Artemis America Partnership ("Artemis America") is a partnership organized under the laws of Delaware that does business in California and is the successor in interest of Artemis America LLC.

24.     The partners of Artemis America are Artemis and Artemis Finance.

25.     Defendant Aurora S.A. ("Aurora S.A.") is a corporation organized under French law that at relevant times did business in California. Aurora S.A. is owned by defendants Artemis and Artemis Finance. Aurora S.A. in turn owns 67 percent of the shares of defendant New California Life Holdings, Inc.

26.     Defendant Francois Pinault ("Pinault") is and was, at all relevant times, an officer, director, and substantial owner of Artemis, Artemis Finance, and Artemis America. Pinault regularly does business in California. (Artemis, Artemis Finance, Aurora S.A., Artemis America, Pinault and their affiliates are hereafter referred to collectively as the "Artemis Parties.")

27.     Defendant New California Life Holdings, Inc. ("NCLH") is a corporation organized under the laws of Delaware and doing business in California. The majority owner of NCLH is defendant Aurora S.A.

28.     Defendant Aurora National Life Assurance Company ("Aurora") is a stock life insurance company organized under the laws of California and has its principal place of business in Los Angeles County, California. Aurora is wholly owned by defendant NCLH.

29.     Morgan, Lewis & Bockius ("MLB") is a law firm that represented

-5-

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1 Altus, MAAF, MAAF Vie, Omnium Geneve, SDI Vendome, Financiere du
2 Pacifique, Artemis, Aurora, and NCLH and acted as their agent and legal counsel at
3 all relevant times.

4     30. At all relevant times, Credit Lyonnais controlled Altus, and there
5 existed a unity of interest between them such that any individuality and separateness
6 between these defendants ceased, and Altus was the alter ego of Credit Lyonnais.
7 Adherence to the fiction of the separate existence of Altus as an entity distinct from
8 Credit Lyonnais would permit an abuse of the corporate privilege and would
9 sanction misrepresentations and promote injustice, because Credit Lyonnais used
10 Altus to commit the wrongdoing described herein.

11     31. Defendants, and each of them, entered into a joint venture, combination
12 or conspiracy illegally to induce the State to sell, transfer and convey to entities
13 owned and controlled by Credit Lyonnais through Altus the business and assets of
14 ELIC seized by the State, including certain bonds from its bond portfolio and its
15 insurance business. Defendants had a community of interest in this undertaking and
16 agreed to share the resulting profits. Therefore, each defendant is responsible for the
17 acts and omissions of each other defendant.

18     32. The wrongful acts and omissions described in this Complaint are
19 attributable to all of the defendants because each was acting as an agent, employee,
20 or alter ego and/or under the direction and control of the others, and such acts and
21 omissions were within the scope of such agency, employment, alter ego, direction,
22 and/or control. Any reference in this Complaint to any act of any defendant shall be
23 deemed to be the act of each defendant acting individually, jointly, or severally.
24 Each of the defendants participated and profited in the conspiracy alleged herein.

25 **CREDIT LYONNAIS AND APOLLO TARGET EXECUTIVE LIFE**
26 **INSURANCE COMPANY FOR ACQUISITION**

27     33. In the late 1970s, working closely with Michael Milken and Drexel
28 Burnham Lambert ("Drexel"), ELIC began to amass a huge portfolio of high yield

| Case No. CV-01-8587 | FIRST AMENDED COMPLAINT |
|---|---|
| AHM (CWx) | DEMAND FOR JURY TRIAL |

SHARTSIS, FRIESE & GINSBURG LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

corporate bonds (commonly called "junk bonds") that had a face value of more than $6 billion.

34. In 1989 and 1990, a series of events caused the junk bond market to decline. Milken, who had been largely responsible for the popularity of junk bonds, pled guilty to charges of securities fraud and was sentenced to serve time in federal prison. Drexel filed for bankruptcy. A new federal law required all savings and loans to sell their junk bond portfolios within five years. Publicity about the junk bond market decline and its impact on ELIC caused many ELIC policyholders to cash out their policies, and this threatened ELIC's financial viability.

35. Defendant Black was a principal colleague of Michael Milken at Drexel. After the collapse of Drexel, he formed his own investment firm, Apollo Advisors, with defendants Hannan, Cogut, Siegel and other associates from Drexel.

36. In March 1990, Black was contacted by an affiliate of Credit Lyonnais. Apollo and Credit Lyonnais through Altus agreed to form three business enterprises:

(a) A "mergers and acquisitions" advisory business, to be known as International Advisors,

(b) An investment advisor business (Lion Advisors) that would seek out American junk bonds for the Altus or Lion Managed Account (the "Managed Account"), and

(c) An investment advisor business (Apollo Advisors) to manage a fund to be known as the Apollo Investment Fund (and later as AIF II) that would invest in common stock of American companies.

37. Credit Lyonnais sought approval from the Federal Reserve Board for the newly formed International Advisors to engage in "non-banking activities," such as mergers and acquisitions. Pending approval, Credit Lyonnais and Apollo operated a joint venture from 1990 to 1993 as CL Global Advisors from the Credit Lyonnais offices in New York.

38. The three Apollo/Credit Lyonnais business enterprises described above

-7-

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

were true joint efforts that involved sharing offices and employees and were presented as a department of Credit Lyonnais. Apollo was more than just an advisor – it took a substantial share of the profits from all three businesses.

39.     Altus and Apollo agreed on a profit sharing arrangement. After a base fee to Apollo and a priority return on capital to Altus, Apollo also received either 22.5 percent, 11.25 percent or 5.625 percent of profits on assets as allocated by Apollo within fund categories.

40.     Altus and Apollo amended their agreement on profit sharing in 1992, in anticipation of their successful acquisition of the bonds and insurance business of ELIC from the State. They agreed to divide the bonds between the Apollo funds and the Managed Account. In addition, they agreed that the insurance business would be an asset subject to Apollo's profit sharing agreement and that Apollo would receive a share of all profits from the insurance business.

41.     Apollo selected and retained virtually all of the financial and legal advisors on matters related to the American investments of its joint venture with Credit Lyonnais. Credit Lyonnais, Altus and Apollo agreed that Apollo would have effectively complete control over all transactions in the United States without interference from the French bank or its affiliates. Altus had veto authority only over large investments and consulted with Apollo only on major strategic issues. Apollo acted as agent of Credit Lyonnais and Altus with respect to all matters relating to ELIC.

42.     In the fall of 1990, Apollo learned that ELIC was attempting to restructure and wanted to sell some of its junk bonds. Apollo initiated negotiations with ELIC and began working with ELIC's actuaries and other financial and legal advisors to study ELIC's business and assets.

43.     In January and February 1991, ELIC officers met with the Commissioner and gave him a written business plan for restructuring ELIC that called for, among other things, a cash infusion from Credit Lyonnais in exchange for

-8-

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1   substantially all of ELIC's high-yield bonds. By early March, Altus and Apollo
2   contemplated that they also would control the restructured company with each
3   owning up to a 25 percent interest.

4       44.   At a meeting on March 7, 1991, with Henin of Altus and Cogut of
5   Apollo, the Commissioner made it clear he would not approve a sale of ELIC's
6   bonds separately from a sale of the insurance business. He also made it clear that he
7   would not approve of Apollo acquiring any share of, or financial interest in, the
8   insurance business, because of Apollo's connections with Milken and Drexel. Black
9   and Hannan flew to Los Angeles to meet with Henin before this meeting, but they
10   advised Henin not to bring up their names with the Commissioner because of their
11   close association with Milken and Drexel. Henin and Cogut knew that there were
12   laws restricting a foreign sovereign from owning a California insurance company
13   and prohibiting banks from owning insurance companies. They knew that Credit
14   Lyonnais was a foreign sovereign and a bank within the meaning of those laws and
15   that it could not own an insurance company.

16       45.   In early April 1991, Apollo and Altus realized that the Commissioner
17   might take legal action against ELIC based on its impaired financial condition and
18   that they could benefit from such action through (a) the purchase of the insurance
19   business after its actual value had been increased by reducing its obligations to its
20   policyholders with "haircuts," and (b) the purchase of the junk bonds at a depressed
21   value – substantially less than they were worth. Apollo also realized that its
22   connections with important members of ELIC's management and key actuarial and
23   other financial advisors would allow Apollo and Altus to control the sale or
24   restructuring of the business. Apollo and Altus also knew the insurance business
25   could be exploited as a "defeasance" or a "run-off" that would generate huge profits
26   from a guaranteed cash flow of approximately $500 million over the first five years.
27   This huge profit could be obtained without the risk of running a continuing insurance
28   business. Because Apollo and Altus knew that they could not purchase the insurance

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-9-

1  business directly without violating U.S. and California law and the Commissioner's
2  prohibitions and that they could not purchase the bonds without the insurance
3  business also being sold, they developed a plan for the acquisition of the insurance
4  business through "fronts" controlled by Altus.

## THE SEIZURE OF ELIC'S ASSETS BY THE STATE

6      46.    On April 11, 1991, the Commissioner filed a petition in the Los Angeles
7  County Superior Court (the "Court"), pursuant to section 1011 of the Insurance
8  Code, and obtained an order vesting title to all of ELIC's assets in the Commissioner
9  in his official capacity as an officer of the State of California, including the bonds
10  and insurance business.    The Order appointed the Commissioner in his official
11  capacity as conservator with authority to continue operating the business or to
12  dispose of its assets.

13      47.    The Commissioner continued discussions with Apollo and Altus, and in
14  May 1991, based on Altus's representations that it could provide legally qualified
15  buyers for the insurance business, the Commissioner announced that he would seek a
16  "definitive agreement" with Altus to sell both the bonds and the insurance business,
17  which would be subject to an over-bid process. The announced criteria required that
18  all bidders have experience in operating a life insurance business and that all bids
19  include purchase of both the insurance business and the bonds.

20      48.    Apollo and Altus/Credit Lyonnais knew they could not meet the
21  announced bidding requirements or their promise to the Commissioner because
22  neither had any experience operating an insurance business, and state and federal law
23  prohibited Altus from owning or operating the insurance business anyway.  Apollo
24  also knew that the Commissioner would not approve of Apollo acquiring any
25  financial interest in the insurance business because of its bad public image as a result
26  of its extensive connections with Drexel and Michael Milken.

27      49.    To avoid the legal impediments imposed by state and federal laws,
28  Altus found "fronts" that it secretly controlled to acquire the insurance business.

-10-

| Case No.  CV-01-8587 | FIRST AMENDED COMPLAINT |
|---|---|
| AHM (CWx) | DEMAND FOR JURY TRIAL |

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1    Apollo knew that Altus controlled these fronts.  MAAF, a small and financially

2    troubled French automobile insurer, agreed to act as the lead "front" for the bidding

3    syndicate being formed by Altus.  Based upon false representations by Altus and

4    Apollo, the Commissioner issued a press release inaccurately describing MAAF as

5    "one of the largest mutual insurance companies in France," and the leader of a group

6    of independent European investors in purchasing and managing the insurance

7    business.  Altus and Apollo also found other fronts to join with MAAF, and Apollo

8    and Altus directed all aspects of the fronts' activities related to the acquisition and

9    control of the insurance business formerly conducted by ELIC.

10        50.    Altus and Apollo ultimately agreed that SDI Vendome, S.A., Financiere

11   du Pacifique, S.A. ("Finapaci"), and defendant Omnium Geneve would join with

12   MAAF to acquire the ELIC insurance business, and, with Apollo's knowledge, Altus

13   made all necessary arrangements with these fronts.  MAAF, MAAF Vie, SDI

14   Vendome S.A., Finapaci, and Omnium Geneve acted as fronts and are collectively

15   referred to as the "MAAF Group."

16        51.    On or about August 7, 1991, the Commissioner, Altus and the MAAF

17   Group signed a "definitive agreement" for the sale of the insurance business and

18   bonds.  Under the definitive agreement, Altus would purchase junk bonds selected

19   by Apollo (the "Bonds"), and the MAAF Group would purchase, rehabilitate, and

20   operate the insurance business and other assets (the "Insurance Business") through

21   the formation of a holding company by the MAAF Group, ultimately known as

22   NCLH, and a new insurance company, Aurora, which would be wholly owned by

23   NCLH.  The Commissioner did not know that the MAAF Group was controlled by

24   Altus or that Apollo would share in the profits generated by the Insurance Business

25   or the Bonds.  California law required disclosure of such an interest.

26                      **DEFENDANTS' CONSPIRACY**

27        52.    Defendants Altus, Credit Lyonnais, Apollo and the MAAF Group

28   joined together in a conspiracy to obtain ownership and control of the Bonds and

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1    Insurance Business from the State.   Said defendants carried out this conspiracy
2    through joint ventures, secret agreements, false public filings and the formation of
3    new entities and agreements involving different defendants at different times.

4         53.    Defendants Aurora and NCLH were the vehicles through which the
5    conspirators accomplished their unlawful scheme.  The Artemis Parties joined their
6    conspiracy in 1992 when they agreed to replace Altus as the beneficial owner of
7    Aurora through NCLH, knowing that the Insurance Business was acquired
8    unlawfully and by false and deceptive means.  Each of these defendants directly or
9    through their agents, including Henin, Black, Cogut, Hannan, Siegel, Seys, Irigoin
10   and MLB, made misrepresentations and false statements for these defendants' joint
11   benefit to conceal their unlawful plans.

12        54.    Defendants' conspiracy and the wrongful acts and omissions committed
13   pursuant to that conspiracy have injured the State in that, but for such wrongdoing,
14   the Commissioner could not and would not have approved the sale of the Bonds and
15   Insurance Business, and he could not and would not have approved defendants'
16   formation and operation of Aurora and NCLH.

17        55.    By reason of defendants' conspiracy and the wrongful acts and
18   omissions committed pursuant to that conspiracy, the State has suffered damage in
19   excess of \$2 billion by the sale of the Insurance Business and Bonds, and all
20   defendants have derived substantial profits from their wrongful acts at the expense of
21   the State and others.   Each defendant is responsible for each act of each other
22   defendant, and each is jointly and severally liable for all damages suffered by the
23   State resulting from their conspiracy as herein alleged.

24              **THE SECRET "PORTAGE" AGREEMENTS**

25        56.    Unknown to the Commissioner, defendants Altus, Credit Lyonnais,
26   MAAF, MAAF Vie, Omnium Geneve and others entered into secret agreements, the
27   purpose of which was to conceal from the Commissioner, the Court and the public
28   the ownership and control of the Insurance Business by Altus and Credit Lyonnais.

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-12-

| Case No.   CV-01-8587 | FIRST AMENDED COMPLAINT |
|---|---|
| AHM (CWx) | DEMAND FOR JURY TRIAL |

1   MAAF, for itself and MAAF Vie, entered into a secret written agreement with Altus

2   to act as a front, referred to as a "Forward Sales Contract" or "portage" agreement.

3   MAAF agreed to transfer the shares of NCLH, which it was forming to acquire the

4   Insurance Business, to Altus or Altus's designee at a future date at a predetermined

5   price. The parties expressly promised to keep the portage agreement secret and not

6   to disclose the agreement's existence to any third party. This secret agreement was

7   signed on August 6, 1991, one day before the "definitive agreement" was signed

8   with the Commissioner.

9         57.    Altus and MAAF, for itself and MAAF Vie, also entered into a

10   "Management Agreement" on August 6, 1991. This agreement required MAAF and

11   MAAF Vie to exercise their rights as shareholders of NCLH only at Altus's

12   direction. This agreement recognized Altus as NCLH's true owner, and it relieved

13   MAAF and MAAF Vie of all responsibility or liability for management or loss in

14   connection with NCLH and Aurora.   Like the Forward Sales Contract, the

15   Management Agreement expressly required the parties to keep it secret.

16         58.    The Forward Sales Agreement, the Management Agreement and the

17   other versions of similar fronting agreements are known, and are sometimes

18   hereafter collectively referred to, as "*contrats de portage*," a French term for

19   contracts used to establish secret fronting relationships. Altus also entered into

20   similar *contrats de portage* with all other members of the MAAF Group.

21         59.    Altus and Apollo agreed that they would control the Insurance Business

22   and share its profit without regard to the ostensible ownership of the MAAF Group.

23   Apollo knew that the other "fronts" would be subject to the control of Altus, and

24   therefore Credit Lyonnais. Apollo also knew that the "fronts" did not exercise any

25   independent management or ownership discretion and that Altus and Apollo

26   determined who the public owners of NCLH and Aurora would be and what actions

27   the public owners would take. Apollo and Altus agreed that Apollo would make

28   virtually all of the business decisions related to the Insurance Business, and that

-13-

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

Apollo had no obligation to communicate with the fronts. Apollo and Altus agreed that none of the MAAF Group would interfere with Apollo's control of the Insurance Business.

60. Defendants, through the secret agreements and other conduct, intended to, and did, make it appear that MAAF and the other "fronts" who made up the MAAF Group were legitimate, independent investors. The "fronts" were intended to, and did, deceive the Commissioner, the Court, other bidders, the policyholders and the public by concealing the true ownership and/or control of the MAAF Group, Aurora and NCLH by Apollo, Altus and Credit Lyonnais.

61. Just as Credit Lyonnais and Altus entered into a secret series of complex arrangements with the MAAF Group to conceal their interests in and their control of the Insurance Business, at a later date, Credit Lyonnais and Altus entered into another series of secret, complex arrangements with the Artemis Parties to finance their acquisition of the Bonds and Insurance Business and to conceal Altus's control of the MAAF Group.

### APPROVAL OF THE ALTUS/NCLH BID AND DEFENDANTS' EFFORTS TO CONCEAL THE INTERESTS OF ALTUS AND APOLLO IN THE INSURANCE BUSINESS

62. As a result of the defendants' false statements, in accordance with the Commissioner's requirement that the Bonds and Insurance Business be sold together, the Commissioner accepted and sought approval of the Altus/NCLH bid for the purchase of the Bonds and Insurance Business, and the Court approved that bid on December 26, 1991. Had the true facts been disclosed, the Commissioner could not and would not have approved the Altus/NCLH bid, because Altus and the MAAF Group would have been disqualified, under state and federal law and under the conditions established by the Commissioner, from acquiring the Bonds and Insurance Business.

63. In February 1992, Altus and Apollo entered into agreements that confirmed Apollo's financial interest in the Bonds and Insurance Business to be

-14-

SHARTSIS, FRIESE & GINSBURG LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  acquired from the State. By a letter agreement in February 1992, Apollo and Altus

2  agreed that that Apollo would be paid 22.5 percent of the first 1/3 of each Insurance

3  Business dividend and 11.25 percent of the remaining 2/3 of each such dividend. In

4  effect, this resulted in a blended rate of 15 percent on all of the Insurance Business

5  dividends. This agreement to pay a share of the Insurance Business profits to Apollo

6  was concealed from the Commissioner. Altus and Apollo also agreed to divide the

7  Bonds into three categories with varying degrees of profits for each.

8  64.  In early 1992, Apollo and Altus induced the Commissioner to allow the

9  Bonds to be transferred immediately to Altus by representing to the Commissioner

10  that there was a substantial risk of loss if the Bonds remained under the control of the

11  Commissioner.  Apollo had superior knowledge of the Bonds and access to

12  information not available to the Commissioner, and the Commissioner relied on the

13  representations of Apollo concerning the gravity of the risk of retaining the Bonds.

14  As a result, on or about March 3, 1992, at the request of the Commissioner, the Court

15  approved the immediate transfer of the Bonds to Altus. Apollo's representations to

16  the Commissioner were false in that Apollo knew that the risk of loss to the State

17  was minimal and that the market value of the Bonds had substantially increased and

18  would continue to rise.

19  65.  On or about July 31, 1992, the Court approved a rehabilitation plan (the

20  "Plan"), which provided for the transfer of the Insurance Business to Aurora. Had

21  the true facts concerning the real owners of Aurora been disclosed, the Insurance

22  Business would not and could not have been transferred to Aurora nor the Bonds

23  transferred to Altus.

24  66.  From November 1991 through December 1992, defendants other than

25  the Artemis Parties filed various applications with the Commissioner in connection

26  with the formation of Aurora, and its parent holding company, NCLH, which were

27  formed by the MAAF Group to acquire the Insurance Business. These applications

28  contained misrepresentations and omissions of material facts about the true

-15-

Case No. CV-01-8587          FIRST AMENDED COMPLAINT
AHM (CWx)                    DEMAND FOR JURY TRIAL

SHARTSIS, FRIESE & GINSBURG LLP

ownership interests of the MAAF Group, and they failed to disclose Altus's ownership through the portage agreements and Apollo's profit interest in Aurora. In December 1992, in reliance on these false applications, the Commissioner approved Aurora's Organizational Permit and NCLH's Certificate of Contribution. On or about December 16, 1992, in further reliance on the false applications and other false statements of defendants other than the Artemis Parties, the Commissioner issued a Certificate of Authority to Aurora to operate an Insurance Business in California. But for these false applications and statements, the Organizational Permit, Certificate of Contribution and Certificate of Authority that allowed NCLH and Aurora to acquire and continue the Insurance Business could not and would not have been approved or issued.

67. In October 1992, Altus and Pinault began negotiations for Artemis S.A., Artemis Finance and Artemis America to step into Altus's shoes by purchasing both the Insurance Business and the Bonds. Henin of Altus explained to Pinault that, by simply letting the Insurance Business wind down or "run off," without any further new business activity, Pinault virtually would be guaranteed tens of millions of dollars of profit without risk. After Pinault indicated his interest in buying the Insurance Business, on or about December 16, 1992, Pinault and Henin flew to New York to meet Black, Hannan, Cogut and other Apollo principals to be sure "they could live together." Apollo gave Pinault a detailed briefing on the structure, cash flow and profitability of the Insurance Business. Apollo made this presentation to Artemis without ever consulting directly with the MAAF Group or getting direct approval from the MAAF Group to sell their interests because Altus was the true owner.

68. An agreement for Altus – not the MAAF Group – to sell the Insurance Business to Artemis was signed in Paris on or about December 24, 1992. In the agreement, Altus explicitly sold to Artemis the right to buy Altus's rights to the Insurance Business, thereby acknowledging and confirming to Pinault and Artemis

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-16-

1    in writing Altus's illegal ownership and control of the Insurance Business. Long
2    after the sale to Artemis was agreed upon in writing in Paris on December 24, 1992,
3    the parties realized how their illegal scheme could be revealed by the original written
4    agreement, and they attempted to cover up their true actions and knowledge. In
5    September 1993, Altus and Artemis explicitly falsified the language in the actual
6    agreement signed on December 24, 1992, to remove reference to Altus's rights to the
7    Insurance Company and substituted language that Altus would make its best efforts
8    to cause Aurora to be transferred to Artemis. The place of the agreement was also
9    changed to New York, and it was backdated to December 16, 1992, apparently for
10   tax purposes.

11       69.    In December 1992, Apollo notified the Commissioner that a new
12   investor would become involved in the Insurance Business, but Apollo did not reveal
13   that the Artemis Parties had purchased the Insurance Business from Altus – not from
14   its ostensible owners, the MAAF Group. In early 1993, the Artemis Parties made
15   their first application to the Commissioner to invest in NCLH and made other
16   applications thereafter, but they never revealed to the Commissioner the prior
17   wrongdoing of Altus, the MAAF Group and their agents or the original December
18   24, 1992, agreement to sell the Insurance Business. The Artemis Parties knew that
19   Credit Lyonnais and Altus had the power to sell the Insurance Business and that
20   Credit Lyonnais and Altus had concealed their ownership of the Insurance Business
21   from the Commissioner. The Artemis Parties knowingly took advantage of Altus's
22   illegal conduct in order to obtain a substantial portion of the profits that would be
23   derived from the illegal transactions.

24       70.    Because Artemis assumed Altus's rights to the Bonds and the Insurance
25   Business, Artemis also assumed Altus's agreement with Apollo to share the profits
26   from each. In an agreement dated December 16, 1992, Artemis agreed that all
27   references to Altus in the "Altus/Lion" agreement would now be considered
28   references to Artemis, and Artemis explicitly assumed "financial responsibility for

-17-

| Case No. CV-01-8587 | FIRST AMENDED COMPLAINT |
| AHM (CWx) | DEMAND FOR JURY TRIAL |

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1    all future compensation due to [Apollo] with respect to the Managed Account."
2    Agents for Apollo and Artemis later confirmed repeatedly, and in writing, that this
3    agreement applied to Apollo's profit interest in the Insurance Business. A separate
4    December 16, 1992, agreement also gave Lion Advisors a power of attorney for
5    Artemis.

6        71.    On or about March 22, 1993, the California Court of Appeal vacated the
7    Court's order approving the Plan, and the case was remanded for further
8    proceedings. Critics of the Plan filed a motion for the Court to rescind the Plan. At
9    the same time, SunAmerica, an unsuccessful bidder, was solicited to make a new
10   offer for the Insurance Business. Apollo knew that such an offer by the American
11   insurer could jeopardize the sale of the Insurance Business to the MAAF Group and
12   could lead to rescission of the sale of the Bonds to Altus.

13       72.    Apollo moved quickly to make a deal with SunAmerica that would
14   preserve as much as possible of Altus's and Apollo's control and anticipated profits.
15   In May 1993, Apollo agreed without contacting the MAAF Group that SunAmerica
16   could acquire one-third of Aurora because it knew that Altus had complete control
17   over these fronts. The true circumstances surrounding this transfer were not revealed
18   to the Commissioner. Apollo was not entitled to any share of the profits from
19   SunAmerica's one-third of the Insurance Business, and Apollo concealed from
20   SunAmerica its right to a share of the rest of the profits.

21       73.    In May and June 1993, not knowing the true facts that were concealed
22   from him, the Commissioner sought judicial approval for a Revised Plan that would,
23   like the prior Plan, transfer ownership of the Insurance Business to Aurora.

24       74.    On or about August 13, 1993, in reliance upon the false statements of
25   the defendants other than the Artemis Parties, the Court approved the Revised Plan,
26   which included the sale of the Insurance Business to the MAAF Group. The Revised
27   Plan was affirmed by the California Court of Appeal in or about February 1995. But
28   for the false statements and concealments of defendants as alleged above, neither the

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-18-

1  Commissioner nor the Court could have or would have allowed the Insurance
2  Business to be sold to the MAAF Group.

3      75.   Starting in September 1993 and continuing until January 1995, Siegel
4  was assigned by Apollo, at its own expense, to work in Aurora's offices in Los
5  Angeles to assure Apollo's continued control over Aurora.  Aurora did not pay
6  Siegel's salary or compensate Apollo directly for Siegel's time and effort.

7  
8  

**APOLLO DIRECTS THE TRANSFER OF THE FRONTS'**
**OWNERSHIP OF NCLH AND AURORA TO ARTEMIS**

9      76.   After the sale of the Insurance Business to Aurora on September 3,
10  1993, Apollo orchestrated a piecemeal transfer to Artemis over time of the MAAF
11  Group's interests in NCLH and Aurora in order to avoid drawing attention to Altus's
12  control and risk losing the whole transaction.  Apollo created the false impression
13  that Artemis was dealing with each front separately and increasing its ownership
14  carefully and incrementally, when in fact the sale of all the MAAF Group's interest
15  had been agreed to with Altus.  The final transfer of all of the MAAF Group's
16  interests to Artemis was deliberately delayed and finally completed in August 1995.

17      77.   In or about March 1994, in accordance with Apollo's direction, the
18  Artemis Parties began the process of seeking the Commissioner's approval to buy
19  certain shares in NCLH held by SDI Vendome.  In July 1994 the Artemis Parties
20  filed an application to buy shares of Finapaci, Omnium Geneve and MAAF Vie.  In
21  their submissions and discussions with the Commissioner, the Artemis Parties knew,
22  but failed to disclose, that these fronts were selling their interests in NCLH at the
23  direction of defendants Apollo, Altus and Credit Lyonnais.  Not knowing the true
24  facts, the Commissioner approved the transfer of NCLH stock.

25      78.   The Artemis Parties repeatedly confirmed that they were obligated to
26  pay Apollo a share of the Insurance Business profits.  In mid 1994, Cogut and Siegel
27  decided to leave Apollo and separate from Black and Hannan.  Black and Cogut
28  agreed that, as part of the division of interests, Cogut and Siegel would receive the

SHARTSIS, FRIESE & GINSBURG LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

-19-

1 rights to Apollo's profit interest in the Insurance Business and Black and Hannan

2 would retain other Apollo interests in exchange. Cogut and Siegel established

3 Pegasus, and Artemis agreed to pay to Pegasus 15 percent of the net profits of the

4 Insurance Business (i.e., Apollo's agreed interest in these profits). In doing so,

5 Artemis assisted in the concealment of Apollo's interest.

6 79. On or after April 5, 1995, defendants CDR Creances, CDR Enterprises,

7 and Consortium de Realization, S.A. ("CDR"), became successors-in-interest to

8 Altus and ratified the acts of Altus by failing to disclose the misrepresentations,

9 despite their knowledge of them, and by enjoying the benefits of Altus's misconduct.

10 Under French law, CDR became responsible for the liabilities of Altus and SBT-

11 Batif.

12 80. In or about July 1995, acting for themselves and the other defendants,

13 the Artemis Parties sought the approval of the Commissioner to purchase NCLH

14 stock held by defendant MAAF Vie. In their submissions to, and discussions with,

15 the Commissioner, Artemis failed to disclose that MAAF Vie was selling its interests

16 in NCLH at the direction of defendants Apollo, Pegasus, Altus and Credit Lyonnais.

17 Not knowing the true facts, on or about August 15, 1995, the Commissioner

18 approved the transfer of stock in NCLH from MAAF Vie to Artemis. But for

19 defendants' false statements and concealment of the true ownership of the shares,

20 that approval could not and would not have been given.

21 81. Aurora and NCLH have continued up to the present time to make

22 periodic filings with the Commissioner that purport to disclose the ownership of

23 NCLH, but they have never disclosed that Altus was the true owner of the NCLH

24 shares that were purportedly owned by the MAAF Group. Aurora and NCLH made

25 such filings by the U.S. mail with knowledge of the falsity of their statements and

26 with the intent to deceive the Commissioner. If the Commissioner had known the

27 identity of the true owners of NCLH, he could not and would not have approved

28 Aurora's declaration of dividends to NCLH, and he could have and would have

-20-

Case No. CV-01-8587     FIRST AMENDED COMPLAINT
AHM (CWx)               DEMAND FOR JURY TRIAL

1  taken corrective action sooner with regard to both the Bonds and Insurance Business.

2  82.    Beginning in 1993 and continuing to the present, Aurora has declared

3  dividends to NCLH from profits generated by the Insurance Business and has paid

4  principal and interest on Certificates of Contribution to NCLH.  NCLH has, in turn,

5  declared dividends that were ultimately transferred to Sun America, the Artemis

6  Parties and Pegasus.  NCLH has also made direct payments of principal and interest

7  to Altus for loans made in connection with Aurora's acquisition of the Insurance

8  Business.

9  **DEFENDANTS' SPECIFIC FALSE STATEMENTS**

10  83.    Defendants repeatedly misrepresented to the State, the Commissioner

11  and his staff, the Court, federal banking regulators, and the public that the

12  Altus/NCLH bid for the ELIC assets was in compliance with the Commissioner's

13  bidding requirements and applicable law.  The false statements described below are

14  examples only and do not recount all such misrepresentations, material omissions

15  and falsehoods.  In every communication described below, the parties omitted a

16  truthful description of the true ownership and control of the fronts, which facts were

17  highly material to the approvals, decisions and other actions being sought.  All

18  defendants who were members of the conspiracy as of the time that each

19  misrepresentation or material omission was made knew of the falsity of that

20  misrepresentation or omission and intended the Commissioner and others to rely on

21  it.  Each of the submissions or representations alleged below was communicated by

22  telephone, U.S. mail, private or commercial carrier, or interstate wire transmission of

23  faxes, unless specifically identified as made in person or open court.  Submissions

24  and representations alleged below as made by MLB were made on behalf of one or

25  more of their clients.  Apollo participated in the preparation of most, if not all,

26  submissions and communications with the Commissioner on behalf of Altus and the

27  other defendants.

28  84.    On or about April 9, 1991, Altus submitted a revitalization plan to the

-21-

Case No.  CV-01-8587                   FIRST AMENDED COMPLAINT
AHM (CWx)                              DEMAND FOR JURY TRIAL

SHARTSIS, FRIESE & GINSBURG LLP

Commissioner that falsely stated that "[t]he investor group will be comprised of major international institutions including Altus Finance [and] . . . [n]either the investment vehicle, nor the other investors will be foreign government controlled."

85. On or about June 7, 1991, Altus submitted a proposed rehabilitation plan to the Commissioner that falsely stated: "[t]he Investor Group being formed under the sponsorship of Altus to fund Newco [i.e., Aurora] will not be controlled by any foreign government and will comply with all requirements of the California Insurance Code."

86. On or about June 18, 1991, Altus submitted a modification to its proposed rehabilitation plan that falsely stated that an independent investor group would purchase the Insurance Business.

87. On or about August 6, 1991, Altus and the MAAF Group signed a definitive agreement with the Commissioner for Altus to purchase the Bonds and for the MAAF Group to purchase the Insurance Business, without disclosing that the MAAF Group was owned and controlled by Altus and Credit Lyonnais.

88. On or about September 17, 1991, MLB submitted a letter on behalf of the MAAF Group to the Commissioner stating that "the [identified] Investors will be the owners of New California Life Holdings." The letter purported to identify to the Commissioner all entities that would have a 10 percent or greater interest in Aurora, but it failed to disclose the interests of Apollo, Altus and Credit Lyonnais in Aurora and NCLH.

89. On or about September 17, 1991, MLB submitted documents to the Commissioner on behalf of Omnium Geneve and SDI Vendome that falsely stated that "Omnium Geneve [and SDI Vendome] intend[ed] to make the investment in [NCLH] from internally generated funds." The statement was false because Altus secretly funded Omnium Geneve's and SDI Vendome's investments.

90. On or about October 11, 1991, Altus and NCLH submitted to the Commissioner a bid package that falsely claimed that the Altus/NCLH bid was in

-22-

FIRST AMENDED COMPLAINT
DEMAND FOR JURY TRIAL

SHARTSIS, FRIESE & GINSBURG LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1   full compliance with the bidding requirements, which included compliance with all
2   state and federal laws.

3       91.    On or about October 18, 1991, Altus and NCLH submitted to the
4   Commissioner a second set of bid documents that falsely claimed that the
5   Altus/NCLH bid was in full compliance with the bidding requirements, which
6   included compliance with all state and federal laws.

7       92.    On or about November 4, 1991, Aurora filed an Application for
8   Organizational Permit with the Commissioner. The application, which was signed
9   by Irigoin under penalty of perjury, purported to disclose all investors in Aurora, but
10  it did not disclose the interests of Altus, Credit Lyonnais and Apollo.

11      93.    On or about November 11, 1991, Altus and NCLH delivered to the
12  Commissioner a third set of bid documents that falsely claimed that the Altus/NCLH
13  bid was in full compliance with the bidding requirements, which included
14  compliance with all state and federal laws.

15      94.    On or about November 18, 1991, during the hearings for approval of the
16  Altus/NCLH bid in Court, defendants falsely represented to the Commissioner, the
17  Court and the parties at the hearing that there was no contract between MAAF and
18  Altus.

19      95.    On or about December 5, 1991, MLB submitted to the Commissioner a
20  declaration by Seys, on behalf of MAAF, that falsely stated that "[no] government
21  entity direct[s], or has the power to direct, the management or policies of [MAAF],
22  or of any person owning directly or indirectly any shares or other interest in [MAAF]
23  by means of any contract."

24      96.    On or about December 11, 1991, Aurora submitted an Amended
25  Application for Organizational Permit to the Commissioner that purported to
26  describe the ownership of Aurora and NCLH. The Application falsely stated that
27  neither Altus nor Credit Lyonnais would own any interest in Aurora or NCLH.

28      97.    On or about December 13, 1991, MLB submitted to the Commissioner

SHARTSIS, FRIESE & GINSBURG LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

-23-

1  declarations by Irigoin, on behalf of MAAF and MAAF Vie, respectively, that
2  falsely stated that "[n]o government entity directs or has the power to direct the
3  management or policies of MAAF and MAAF Vie, or any persons owning directly
4  or indirectly any share or other interest in MAAF and MAAF Vie by means of any
5  contract."

6  98.   On or about December 24, 1991, MLB submitted to the Commissioner
7  another declaration by Irigoin, that falsely stated again that "[n]o government entity
8  direct[s] or had the power to direct the management or policies of MAAF, MAAF
9  Vie, or any persons owning directly or indirectly any share or other interest in
10  [MAAF and MAAF Vie] by means of any contract."

11  99.   Also on or about December 24, 1991, MLB submitted to the
12  Commissioner a declaration from SDI Vendome that falsely stated that "[n]o
13  government entity direct[s] or had the power to direct the management or policies of
14  [SDI Vendome], or any persons owning directly or indirectly any share or other
15  interest in [SDI Vendome] by means of any contract."

16  100.  In February and March of 1992, defendants other than the Artemis
17  Parties made additional misrepresentations to the Commissioner. For example, on or
18  about February 12, 1992, they submitted additional documents to the Commissioner
19  that purported to disclose all of Altus's and Credit Lyonnais's interests in the MAAF
20  Group but did not disclose the secret *contrats de portage* or the true interests of
21  Apollo, Altus and Credit Lyonnais in Aurora and NCLH.

22  101.  On or about March 11, 1992, MLB submitted to the Commissioner a
23  document purporting to disclose all business dealings and arrangements between
24  Altus or Credit Lyonnais and Finapaci, MAAF or MAAF Vie. The document failed
25  to disclose the existence of the secret *contrats de portage*, the complete terms of
26  financing of the fronts or the true interests of Apollo, Altus and Credit Lyonnais in
27  Aurora and NCLH. This document falsely stated: "There are no contracts or similar
28  arrangements presently in effect pursuant to which Altus/Credit Lyonnais (or

-24-
Case No. CV-01-8587          FIRST AMENDED COMPLAINT
AHM (CWx)                    DEMAND FOR JURY TRIAL

affiliates) exert or can exert, directly or indirectly, control over the management or policies of MAAF, MAAF Vie or their affiliates."

102. On or about March 24, 1992, Jacques Thunnissen, a representative of defendant Omnium Geneve, executed a document under penalty of perjury that purported to disclose all business dealings and arrangements between Altus or Credit Lyonnais and Omnium Geneve. This document falsely stated that "[t]here are no contracts or similar arrangements presently in effect pursuant to which Altus/Credit Lyonnais (or affiliates) exert or can exert, directly or indirectly, control over the management or policies of Omnium Geneve or its affiliates."

103. On or about March 26, 1992, MLB sent the Commissioner statements executed under penalty of perjury that falsely stated "[t]here are no contracts or similar arrangements presently in effect pursuant to which Altus/Credit Lyonnais (or affiliates) exert or can exert directly or indirectly, control over the management or policies of MAAF, MAAF Vie or their affiliates."

104. On or about April 7, 1992, MLB on behalf of Aurora falsely represented to the Commissioner that: "There is no 'side agreement' or understanding that Aurora will be purchasing assets from, or selling assets to, Altus/Credit Lyonnais in the future . . . . We would also note that Altus/Credit Lyonnais will not be 'affiliated' with Aurora, Holdco [NCLH] or any of the Investor Group's members."

105. On or about April 8, 1992, Aurora filed an Amended Application for Organizational Permit with the Commissioner. The Amended Application purported to disclose all investors in Aurora, but it failed to disclose the true interests of Apollo, Altus and Credit Lyonnais.

106. On or about April 14, 1992, MLB submitted to the Commissioner a declaration by Thunnissen, on behalf of Omnium Geneve, that falsely stated that "[no] government entity direct[s], or has the power to direct, the management or policies of [Omnium Geneve], or of any person owning directly or indirectly any shares or other interest in [Omnium Geneve] by means of any contract."

-25-

107. On or about May 1, 1992, MLB submitted to the Commissioner a supplemental statement from SDI Vendome, that falsely stated that there are no "dealings or relationships existing between the AMA Group (Alain Mallart), on the one hand, and Altus or the Altus Parties on the other, such as to give Altus the means, directly or indirectly, to exercise control over any member of the AMA Group or Vendome."

108. On or about August 21, 1992, and on several occasions thereafter, including but not limited to August 28, 1992, and October 6, 1992, MLB submitted an Application to Amend Organizational Permit that purported to disclose all parties that would own or control Aurora and NCLH, but this Application failed to disclose the secret *contrats de portage*, and the interests of Apollo, Altus and Credit Lyonnais.

109. On or about October 9, 1992, Aurora filed with the Commissioner an Application to Amend Organizational Permit, which purported to disclose all investors in Aurora, but this Application failed to disclose the secret *contrats de portage* and the interests of Apollo, Altus and Credit Lyonnais.

110. On or about December 3, 1992, Aurora filed with the Commissioner an Application to Amend Organizational Permit, which purported to disclose all investors in Aurora, but this Application failed to disclose the secret *contrats de portage* and the interests of Apollo, Altus and Credit Lyonnais.

111. On or about May 7, 1993, Aurora submitted to the Court a pleading entitled "Opposition of Aurora and Joinder in Commissioner's Opposition to Motion for Order Directing Compliance or Proof of Compliance by Commissioner with Federal Bank Holding Act and California Insurance Code." This pleading falsely stated that "Altus has no ownership interest in New California, no interest in the profits of New California, and no right to control the operation or management of Aurora."

112. On or about May 20, 1993, Aurora submitted to the Court a joint

-26-

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1  response with the Commissioner to a request from ANVEL, a policyholder group,
2  for information regarding Aurora's direct and indirect ownership. This response
3  stated: "Last week, Aurora filed its response to Texas Commerce Bank's motion
4  relating to alleged foreign ownership issues. The equity owners of New California
5  Life Holdings, the parent of Aurora, were disclosed. Those investors have also been
6  disclosed to ANVEL at meetings and in written materials." Defendants knew that
7  these statements and "disclosures" were false and failed to disclose the interests of
8  Apollo, Altus and Credit Lyonnais.

9      113.  On or about October 13, 1993, MLB submitted an application to the
10 Department of Insurance that requested approval to transfer the NCLH stock of S.A.
11 Chauray Valeurs to MAAF Vie. This Application falsely stated that the transfer
12 should be of no consequence because both S.A. Chauray Valeurs and MAAF Vie
13 were owned by MAAF, when in fact Altus and Credit Lyonnais were the true owners
14 of the NCLH stock.

15     114.  On or about March 23, 1994, Artemis submitted a Form A Information
16 Statement to the Commissioner seeking approval to purchase 249 of SDI Vendome's
17 shares of NCLH when Artemis knew that it was purchasing the shares from Altus.

18     115.  On or about May 17, 1994, Artemis submitted a Second Supplemental
19 Filing to its Form A Information Statement to the Commissioner, which falsely
20 stated that "Artemis is interested in the acquisition of additional shares of NCLH, but
21 has not entered into any firm agreements to do so." Artemis already had entered into
22 a contract with Altus, under which Altus sold Artemis all of its interests in NCLH.

23     116.  On or about July 1, 1994, Artemis submitted a Form A Information
24 Statement to the Commissioner to purchase all of Omnium Geneve's and Finapaci's
25 shares in NCLH, as well as a portion of MAAF Vie's shares. Artemis knew, but did
26 not disclose, that it was really purchasing these shares from Altus.

27     117.  On or about August 16, 1995, Artemis directly and falsely stated to the
28 Commissioner that "I affirm the representations made to you . . ." about the price of

-27-

1  shares, the ownership of Artemis, compliance with California's foreign sovereign

2  statutory requirements and the purchase of Artemis' interest in NCLH shares held by

3  MAAF Vie being made from internally-generated funds, knowing that each of these

4  representations was false. In all of Artemis's filings with the Commissioner, it stated

5  that it was purchasing the shares of the various fronts with internally generated

6  funds. Artemis failed to disclose to the Commissioner that Artemis's purchases were

7  funded by Credit Lyonnais.

8      118. On numerous other occasions, defendants also made misrepresentations

9  by telephone, in person, and by U.S. mail to the Board of Governors of the Federal

10  Reserve System regarding the participation of Altus and Credit Lyonnais in the

11  Court proceedings concerning ELIC.

12      119. For example, in a letter dated August 19, 1991, the law firm of Sullivan

13  & Cromwell, counsel for Credit Lyonnais and Altus, misrepresented to the General

14  Counsel of the Federal Reserve Board that, subsequent to the transfer of the

15  Insurance Business to Aurora, Altus would have "no continuing role with" the

16  MAAF Group. That letter further falsely stated: "The Credit Lyonnais involvement

17  in the Proposed Transaction consists of the Altus loan, the commitment letters, and

18  Altus's purchase of the high-yield Bonds.  In particular, Credit Lyonnais, its

19  affiliates and employees (the 'Credit Lyonnais Group') will own no common stock

20  or other equity securities of Aurora or NCLH." The letter went on to falsely state

21  that "The Credit Lyonnais Group will not control any aspect of the business of

22  either" Aurora or NCLH. The letter failed to disclose the secret *contrats de portage*

23  and the true interests of Apollo, Altus and Credit Lyonnais in Aurora and NCLH.

24      120. The foregoing statements were made with the intent to deceive the

25  Federal Reserve Board, so that it would not object to the sale of the Bonds and

26  Insurance Business to Altus and the MAAF Group by the Commissioner acting for

27  the State.

28      121. Credit Lyonnais, Altus, Apollo, MAAF, MAAF Vie, and Omnium

-28-

Case No. CV-01-8587   FIRST AMENDED COMPLAINT
AHM (CWx)            DEMAND FOR JURY TRIAL

1    Geneve, as direct and indirect parties to the various agreements giving ownership
2    and control of NCLH to Altus and Credit Lyonnais, were aware of the falsity of the
3    statements, applications, and pleadings alleged herein. These statements were made
4    and these applications and pleadings were filed with knowledge of their falsity with
5    the intent to conceal the true facts and with the intent to deceive the State, the
6    Commissioner, and the Court, and the public, to induce them to act in reliance on
7    those false and deceptive documents in the manner described above, and with the
8    expectation that they would so act. These acts were undertaken to enable Altus to
9    acquire both the Bonds and the Insurance Business.

10    122. At the time of Artemis's purchase of NCLH common stock, the Artemis
11    Parties were aware of Altus's control of the MAAF Group and of Apollo's financial
12    interest in the Insurance Business, but they misrepresented and failed to disclose
13    these facts and their own secret financing to the Commissioner. The Artemis Parties
14    failed to disclose this information and made these misrepresentations with the intent
15    to deceive the Commissioner, to induce him to act in reliance upon those omissions
16    and statements in the manner described above, and with the expectation that he
17    would so act.

18    **CONCEALMENT AND DISCOVERY OF THE STATE'S CLAIMS**

19    123. At the time of the acts, omissions and concealments described herein,
20    the State was ignorant of the falsity of defendants' statements, applications, and
21    filings.    The State could not, with reasonable diligence, have discovered the
22    misrepresentations and concealment of defendants until February 1999, because
23    defendants actively concealed their misconduct and agreed to keep secret the
24    *contrats de portage* and their other deceptive secret agreements. In addition, in order
25    to conceal the true facts, defendants made affirmative public statements and
26    representations to mislead the Commissioner in carrying out his duties on behalf of
27    the State.

28    124. Defendants' misrepresentations and knowledge of the true relationship

-29-

| Case No.  CV-01-8587 | FIRST AMENDED COMPLAINT |
| AHM (CWx) | DEMAND FOR JURY TRIAL |

SHARTSIS, FRIESE & GINSBURG LLP

1    between Altus and the MAAF Group, and the extent to which Altus and Credit

2    Lyonnais controlled the MAAF Group, first became known to the Attorney General

3    of California in February 1999 as the result of the original *qui tam* plaintiff's false

4    claims complaint.    Apollo's and the Artemis Parties' wrongdoing first became

5    known to the Attorney General in 2001 during the course of his investigation.

6        125.  As a result of the affirmative efforts of the defendants to conceal the

7    existence of the secret agreements, arrangements and undisclosed facts as alleged

8    throughout this Complaint and as a result of the various false statements by

9    defendants and their agents that there were no contracts or agreements of any kind

10   that gave Apollo, Altus or Credit Lyonnais any control over the MAAF Group,

11   NCLH or Aurora, or that gave Apollo a financial interest in the Insurance Business,

12   the State had no reason to believe that any falsehoods or violations of law had

13   occurred.  Prior to February 1999, the State had neither actual nor constructive notice

14   of the acts described herein.  Any period of limitations that might otherwise have run

15   is therefore extended by the doctrine of equitable tolling.

## FIRST COUNT

### False Claims Act - Gov. Code §§ 12650, *et seq.*
### (Against All Defendants)

19       126.  The State incorporates by reference the allegations in paragraphs 1

20   through 125 of this Complaint.

21       127.  This is a claim for treble damages and penalties under the California

22   False Claims Act, Government Code sections 12650 *et seq.*

23       128.  The Altus/NCLH bids, including without limitation the definitive

24   agreement, and the various representations, applications, and submissions described

25   above by means of which defendants acquired the Bonds and the Insurance Business

26   from the State, acting through the Commissioner, constitute one or more false claims

27   within the meaning of Government Code sections 12650 *et seq.*

28       129.  By the conduct and acts described above, defendants Credit Lyonnais,

-30-

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1  Apollo, Black, Hannan, Cogut, Siegel, Pegasus, Henin, Altus, MAAF, MAAF Vie,

2  Omnium Geneve, the Artemis Parties, Aurora, and NCLH committed various

3  violations of the California False Claims Act within the meaning of Government

4  Code section 12651, including without limitation:

5         (a)     Said defendants knowingly presented or caused to be presented to

6  an officer and to employees of the State false claims for approval, in violation of

7  Government Code section 12651(a)(1), by submitting the various Altus/NCLH bids

8  and related bid documents to the Commissioner acting as an officer of the State and

9  to employees of the California Department of Insurance with knowledge that they

10  were false and that defendants could not meet the bidding requirements and that

11  federal and state law prohibited defendants from directly or indirectly owning or

12  controlling the Insurance Business.

13         (b)     Defendants knowingly made, used, and caused to be made or

14  used false records and statements to get a false claim approved by the State, in

15  violation of Government Code section 12651(a)(2), by making and using and

16  causing to be made and used the numerous statements and records described above

17  which falsely misrepresented the relationships and affiliations between the

18  defendants and concealed the secret *contrats de portage* in order to get the

19  Altus/NCLH bids approved by the State, to obtain authority to conduct the Insurance

20  Business in this State, and to transfer ownership interests in entities approved by the

21  State.

22         (c)     Defendants conspired to get a false claim allowed by the State, in

23  violation of Government Code section 12651(a)(3), by entering into the agreements

24  described above to unlawfully obtain ownership and control of the Bonds and

25  Insurance Business and to illegally own and operate the Insurance Business and by

26  submitting the various false bids, records, and statements to the State.

27         (d)     Defendants knowingly made, used and caused to be made or used

28  false records and statements to get a false claim approved by the State, in violation of

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1    Government Code section 12651(a)(6), by entering into the agreements described

2    above to obtain ownership and control of the Bonds and Insurance Business, which

3    they knew the Commissioner could not legally sell to them, and to obtain approval of

4    the transfer of interests in the Insurance Business and approval of dividends that they

5    knew the Commissioner could not legally approve.

6           (e)    Defendants knowingly made, used, and caused to be made and

7    used a false record or statement to conceal, avoid, or decrease an obligation to pay or

8    transmit money to the State, in violation of Government Code section 12651(a)(7),

9    by making and using and causing to be made and used the numerous statements and

10   records described above, which falsely misrepresented the affiliations between the

11   defendants and concealed the secret *contrats de portage*, in order to avoid or

12   decrease the amount of their obligation to pay or transmit money to the State.

13          (f)    To the extent any defendant did not know about, or knowingly

14   participate in, the making of any of the false claims described above within the

15   meaning of Government Code section 12650(b)(2), such defendant is a beneficiary

16   of an inadvertent submission of a false claim to the State who subsequently

17   discovered the falsity of the claims and failed to disclose them to the State within a

18   reasonable time after such discovery, in violation of Government Code section

19   12651(a)(8), in that each defendant benefited and obtained substantial profits from

20   the Commissioner's acceptance and approval of the Altus/NCLH bid and the

21   resulting ownership, formation, operation, and management of the Bonds and

22   Insurance Business by defendants.

23          130.   Had the Commissioner known the true facts, he could not and would not

24   have approved the Altus/NCLH bid for the Bonds and Insurance Business or sold or

25   conveyed the Bonds or Insurance Business to any of the defendants.

26          131.   As a result of the foregoing acts, defendants are liable to the State for

27   three times the amount of damages sustained by the State, which is in excess of

28   \$2 billion, and civil penalties, as prayed for below.

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

---

# SECOND COUNT

## Unfair Competition - Bus. & Prof. Code § 17200
## (Against All Defendants)

132. The State incorporates by reference the allegations in paragraphs 1 through 131 of this Complaint.

133. Beginning at an exact date unknown to the State and continuing to the present, all defendants have engaged in, and are still engaging in, unfair competition as defined in Business and Professions Code section 17200, in the City and County of Los Angeles and elsewhere in California.

134. Such unfair competition includes, but is not limited to, the following acts or practices:

(a) Defendants violated the California False Claims Act, Government Code sections 12650 *et seq.*, by the acts and practices set forth above.

(b) Defendants violated Insurance Code sections 699.5 and 1215 *et seq.*, and California Code of Regulations, Title 10, sections 2683 *et seq.*, by the acts and practices described above, including without limitation:

(i) Acquiring ownership and control of the Insurance Business and Bonds, Aurora, and NCLH by Altus and Credit Lyonnais as agencies of a foreign government.

(ii) Entering into secret agreements to acquire control of the Insurance Business and Bonds, Aurora, and NCLH without disclosing or providing to the Commissioner the information required by Insurance Code section 1215.2(a).

(iii) Failing to file with the Commissioner a statement containing the information specified by Form A in connection with the acquisition of ownership and control of the Insurance Business and Bonds, Aurora, and NCLH, as required by Code of Regulations, Title 10, sections 2683.18 and 2683.23.

(iv) Failing to furnish the Commissioner with such other or further information and material necessary to make the information defendants

-33-

Case No. CV-01-8587 AHM (CWx) — FIRST AMENDED COMPLAINT DEMAND FOR JURY TRIAL

1   actually provided in connection with their acquisition of ownership and control of

2   the Insurance Business and Bonds, Aurora, and NCLH not misleading, as required

3   under Code of Regulations, Title 10, section 2683.21.

4                (v)   Failing to disclose to the Commissioner the true ownership

5   and control of Aurora in an initial registration statement and annual registration

6   statements thereafter as required under Insurance Code section 1215.4(b), and

7   specified in Form B, Code of Regulations, Title 10, sections 2683.8 and 2683.23, in

8   connection with the ownership, control, and operation of Aurora and NCLH.

9          (c)   Defendants violated the Bank Holding Company Act, 12 U.S.C. §

10   1841 *et seq.*, by the acts and practices described above, including without limitation,

11   the acquisition and retention by Credit Lyonnais and Altus, in collaboration with the

12   other defendants, of direct or indirect ownership or control of more than five percent

13   of the voting shares of NCLH and Aurora, in violation of 12 U.S.C. § 1843.

14          (d)   Defendants violated California Penal Code sections 118 *et. seq.*,

15   in that they committed perjury and/or aided or abetted perjury by the acts and

16   practices described above, including without limitation making false statements

17   under oath in the applications and filings discussed above pursuant to Insurance

18   Code sections 1215 *et seq.*, California Code of Regulations, Title 10, sections 2683

19   *et seq.*, and the Bank Holding Company Act, 12 U.S.C. § 1843 *et seq.*, and in the

20   court proceedings, as well as in the official investigation of the *qui tam* complaint in

21   this case.

22          (e)   Defendants violated 18 U.S.C. § 1341, which prohibits engaging

23   in mail fraud, by the acts and practices set forth above.

24          (f)   Defendants violated 18 U.S.C. § 1343 by the acts and practices

25   set forth above.

26          (g)   Defendants violated 18 U.S.C. § 1961, et seq., in that they have

27   used the U.S. mail and telephones in furtherance of a conspiracy to defraud by the

28   acts and practices set forth above.

-34-

| Case No.  CV-01-8587 | FIRST AMENDED COMPLAINT |
|---|---|
| AHM (CWx) | DEMAND FOR JURY TRIAL |

SHARTSIS, FRIESE & GINSBURG LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

(h)    Defendants committed unfair and deceptive acts and practices in the conduct of their business as alleged above that caused substantial injury to the State and others.

135.   Defendants concealed their conduct, and the State was unable to discover the conduct, as more fully alleged above, such that the filing of this claim is timely.

136.   As a result of the foregoing acts, the State is entitled to civil penalties and an order for restitution of all monies and property obtained and disgorgement of all profits derived therefrom as well as injunctive relief, all as hereafter prayed.

## **THIRD COUNT**

### **RICO (18 U.S.C. §1962(b))**
### **(Against All Defendants)**

137.   The State incorporates by reference the allegations in paragraphs 1 through 136 of this Complaint.

138.   Aurora and NCLH constitute enterprises engaged in and whose activities affect interstate and foreign commerce.

139.   Defendants directly and indirectly acquired and maintained interests in and control of the enterprises referenced in paragraph 138 above through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

140.   Pursuant to and in furtherance of their unlawful schemes, defendants committed numerous related acts of mail fraud (as defined in 18 U.S.C. § 1341) and wire fraud (as defined in 18 U.S.C. § 1343) as set forth above. Those acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

141.   As a direct and proximate result of defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), the State has been injured in its business and property in that it was induced to sell the Bonds and Insurance Business to defendants at substantially less than their worth, resulting in damages to the State in excess of $2 billion.   Defendants' conduct also injured others, including

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-35-

1  policyholders and creditors of ELIC, whose policies were surrendered or modified to

2  a reduced value.  In addition, the State incurred substantial costs as a result of

3  litigation commenced by parties other than the Commissioner based on defendants'

4  wrongful conduct and the lack of finality associated with such litigation.

5      142.  As a result of the foregoing, defendants are liable to the State for

6  damages in an amount not less than $2 billion, which amount is subject to trebling,

7  costs and attorneys fees and for other relief prayed for below.

## FOURTH COUNT

### RICO (18 U.S.C. § 1962(c))
### (Against All Defendants)

11      143.  The State incorporates by reference the allegations in paragraphs 1

12  through 142 of this Complaint.

13      144.  The MAAF Group formed by defendants to enable them to acquire the

14  Bonds and Insurance Business through the formation and maintenance of a new

15  California insurer and holding company was and is an enterprise or enterprises

16  engaged in and whose activities affect interstate and foreign commerce.  Defendants

17  are employed by or associated with the enterprise(s).

18      145.  Aurora and NCLH also constitute enterprises engaged in and whose

19  activities affect interstate and foreign commerce.  Defendants are employed by or

20  associated with, or have financial interests in those enterprises.

21      146.  Defendants agreed to and did conduct and participate in the conduct of

22  the affairs of the enterprises referenced above through a pattern of racketeering

23  activity and for the purpose of unlawfully obtaining ownership and control of the

24  Bonds and Insurance Business and the profits they generated, forming a new

25  insurance company and its parent holding copying, issuing and transferring stock of

26  NCLH, and operating the Insurance Business through the new companies.

27      147.  Pursuant to and in furtherance of their unlawful scheme, defendants

28  committed numerous related acts of mail fraud (as defined in 18 U.S.C. § 1341) and

-36-

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

1  wire fraud (as defined in 18 U.S.C. § 1343) as set forth above. Those acts constitute

2  a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

3  148. Defendants have directly and indirectly conducted and participated in

4  the conduct of the affairs of the enterprises referenced in paragraphs above through

5  the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962

6  (c).

7  149. As a direct and proximate result of defendants' racketeering activities

8  and violations of 18 U.S.C. § 1962(c), the State has been injured in its business and

9  property in that it was induced to sell the Bonds and Insurance Business to

10  defendants at substantially less than their worth, resulting in damages to the State in

11  excess of $2 billion. Defendants' conduct also injured others, including

12  policyholders and creditors of ELIC, whose policies were surrendered or modified to

13  a reduced value. In addition, the State incurred substantial costs as a result of

14  litigation commenced by parties other than the Commissioner based on defendants'

15  wrongful conduct and the lack of finality associated with such litigation.

16  150. As a result of the foregoing, defendants are liable to the State for

17  damages in an amount not less than $2 billion, which amount is subject to trebling,

18  costs and attorneys fees and for other relief prayed for below.

19  ## FIFTH COUNT

20
21  ### RICO (18 U.S.C. § 1962(d))
   ### (Against All Defendants)

22  151. The State incorporates by reference the allegations in paragraphs 1

23  through 150 of this Complaint.

24  152. The MAAF Group formed by defendants to enable them to acquire the

25  Bonds and Insurance Business and to operate the Insurance Business through the

26  formation and maintenance of a new California insurer and holding company was

27  and is an enterprise or enterprises engaged in and whose activities affect interstate

28  and foreign commerce.

SHARTSIS, FRIESE & GINSBURG LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

-37-

1    153. Aurora and NCLH also constitute enterprises engaged in and whose

2    activities affect interstate and foreign commerce.

3    154. As set forth above, defendants agreed and conspired to violate 18

4    U.S.C. §§ 1962 (b) and (c). Defendants intentionally conspired and agreed to

5    acquire or maintain interests in the enterprises referenced in paragraphs above

6    through a pattern of racketeering activity and to conduct and participate in the

7    conduct of the affairs of those enterprises through a pattern of racketeering activity.

8    155. Defendants knew that their actions were part of a pattern of racketeering

9    activity and agreed to the commission of those acts to further the schemes described

10   above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (b) and (c)

11   in violation of 18 U.S.C. § 1962(d).

12   156. As a direct and proximate result of defendants' racketeering activities

13   and violations of 18 U.S.C. § 1962(d), the State has been injured in its business and

14   property in that it was induced to sell the Bonds and Insurance Business to

15   defendants at substantially less than their worth, resulting in damages to the State in

16   excess of $2 billion.    Defendants' conduct also injured others, including

17   policyholders and creditors of ELIC, whose policies were surrendered or modified to

18   a reduced value. In addition, the State incurred substantial costs as a result of

19   litigation commenced by parties other than the Commissioner based on defendants'

20   wrongful conduct and the lack of finality associated with such litigation.

21   157. As a result of the foregoing, defendants are liable to the State for

22   damages in an amount not less than $2 billion, which amount is subject to trebling,

23   costs and attorneys fees and for other relief prayed for below.

24   ## SIXTH COUNT

25
26   ### Accounting
     ### (Against All Defendants)

27   158. The State incorporates by reference the allegations in paragraphs 1

28   through 157 of this Complaint.

-38-

SHARTSIS, FRIESE & GINSBURG LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

159. Based on the actions and deceit of defendants, plaintiff is entitled to recover, by virtue of the claims for relief set forth above, the value of the Bonds and the proceeds therefrom, as well as the proceeds and dividends derived from the Insurance Business. The current value of the Bonds, the amount of the proceeds, to whom the proceeds were paid, or where they were reinvested is so complicated that it can not be determined without an accounting. The amounts of the proceeds and dividends from the Insurance Business and the distribution of said proceeds and dividends are so complicated that they can not be determined without an accounting. Moreover, this information concerning the Bonds and the Insurance Business is uniquely within the knowledge of defendants. The amount due to the State would be shown through an accounting.

## PRAYER FOR RELIEF

WHEREFORE, the State prays for relief against all defendants as follows:

As to the First Count:

1. For damages in an amount not less than $2 billion, such damages to be trebled;

2. Civil penalties in the amount of $10,000 for each false claim; and

3. All costs including attorneys fees incurred by the Attorney General in investigating and prosecuting the claims.

As to the Second Count:

4. An order that defendants disgorge all monies acquired by means of any act or practice found by this court to be an unlawful, unfair, or fraudulent business act or practice under California Business and Professions Code sections 17200 *et seq.* and take all other steps necessary to make plaintiff whole from the acts and omissions of defendants set forth above and that they pay such penalties as are authorized by law;

5. Such appropriate injunctive relief as is required to prevent future or additional unlawful, unfair, or fraudulent business acts or practices by defendants;

-39-

1  and

2       6.    Civil penalties for each offense in the amount of $2,500.

3       As to the Third Count, Fourth and Fifth Counts:

4       7.    For damages in an amount not less than $2 billion, such damages to be

5  trebled;

6       8.    For reasonable attorneys fees as provided by 18 U.S.C. §1964(c).

7       As to the Sixth Count:

8       9.    An order requiring that defendants account to plaintiff for all profits and

9  proceeds earned from or taken in exchange for the property described above.

10      As to all Counts:

11      10.    Costs of suit, including attorneys' fees; and

12      11.    Such further or additional relief as the court deems proper.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-40-

Dated: January 29, 2002

BILL LOCKYER
Attorney General of the State of California
CHRISTOPHER M. AMES
Senior Assistant Attorney General

By _____
ANTHONY M. BOVA, DEPUTY ATTORNEY GENERAL
SHARTSIS, FRIESE & GINSBURG LLP

By _____
ARTHUR J. SHARTSIS
Attorneys for Plaintiff
STATE OF CALIFORNIA

# DEMAND FOR JURY TRIAL

The State hereby demands trial by jury as to all claims triable by jury.

Dated: January 29, 2002

SHARTSIS, FRIESE & GINSBURG LLP

By _____
ARTHUR J. SHARTSIS
Attorneys for Plaintiff
STATE OF CALIFORNIA

MJS\6130\001\1175057.1A

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

**PROOF OF SERVICE**

I, PATRICIA VOIGHT, declare:

1.     I am employed in the City and County of San Francisco, California by Shartsis, Friese & Ginsburg LLP at One Maritime Plaza, 18th Floor, San Francisco, California 94111.

2.     I am over the age of eighteen years and am not a party to the within cause.

3.     I am readily familiar with Shartsis, Friese & Ginsburg LLP's practice for collection and processing of correspondence and documents for mailing with the United States Postal Service, which in the normal course of business provides for the deposit of all correspondence and documents with the United States Postal Service on the same day they are collected and processed for mailing.

4.     On January 29, 30, 2002, at Shartsis, Friese & Ginsburg LLP located at the above-referenced address, I served the attached FIRST AMENDED COMPLAINT FOR VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT, UNFAIR COMPETITION, CIVIL RICO AND ACCOUNTING; DEMAND FOR JURY TRIAL on the interested parties in said cause by

___ personal delivery by messenger service of the document(s) above to the person(s) at the address(es) set forth below:

_X_ placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in accordance with the firm's practice of collection and processing correspondence for mailing to the person(s) at the address(es) set forth below:

___ facsimile transmission pursuant to Rule 2008 of the California Rules of Court on this date before 5:00 p.m. (PST) of the document(s) listed above from sending facsimile machine telephone number (415) 421-2922, and which transmission was reported as complete and without error (copy of which is attached), to facsimile number(s) set forth below:

___ consigning the document(s) listed above to an express delivery service for guaranteed delivery on the next business day to the person(s) at the address(es) set forth below:

**SEE SERVICE LIST ATTACHED**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: January 30, 2002

PATRICIA VOIGHT

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-1-

**SERVICE LIST**
Case No. CV 01-8587

Mark T. Jansen
Townsend and Townsend and Crew LLP
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111-3834
415-576-0200
415-576-0300 FAX

David I. Stauber
Whitney I. Gerard
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
212-408-5100
212-541-5369 FAX

Boynton M. Rawlings
Terrence M. Dellecker
Rawlings & Giles LLP
53, Avenue Montaigne
75008 Paris FRANCE
011-331-4256-1400
011-331-4256-5400 FAX

Stephen R. Smereck
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071-3197
213-229-7000
213-229-6324 FAX

Robert L. Weigel
Marshall R. King
Gibson Dunn & Crutcher
200 Park Avenue
New York, NY 10166-0193
212-351-4000
212-351-4035 FAX

Richard D. Bernstein
Virginia A. Seitz
Sidley Austin Brown & Wood
1501 "K" Street NW
Washington, DC 20005
202-7260-8000
202-736-8711 FAX

Theodore N. Miller
Robert A. Holland
Linda Peterson
Joshua Anderson
Sidley Austin Brown & Wood
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
213-896-6000
213-896-6600 FAX

George Newhouse
Thelen, Reid & Priest LLP
333 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
213-621-9800
213-623-4742 FAX

Gary L. Fontana
Karl D. Belgum
Kathryn McQueen
Thelen, Reid & Priest LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
415-371-1200
415-369-7000 FAX

Thomas McGanney
Richard J. Holwell
Donald MacNaughton
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
212-819-8200
212-354-8113 FAX

Richard J. Ney
Susan St. Denis
Chadbourne & Parke LLP
350 South Grand Avenue, Suite 3300
Los Angeles, CA 90017
213-892-1000
213-622-9865 FAX

C. Randolph Fishburn
R. Todd Bates
Joseph Nocella
White & Case LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
213-620-7700
213-687-0758 FAX

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-2-

Case No. CV 01-8587
(AHM) (CWx)

PROOF OF SERVICE

1    Lawrence Friedman
     Mitchell A. Lowenthal
2    Jennifer Kroman
     Cleary, Gottlieb, Steen & Hamilton
3    One Liberty Plaza
     New York, NY 10006-1470
4    212-225-2000
     212-225-3999 FAX
5

Alice Kelly
McCutchenn Doyle Brown & Enersen LLP
Three Embarcadero Center
San Francisco, CA 94111
415-393-2000
415-393-2286 FAX

6    Michael Pyle
     McCutchen, Doyle, Brown & Enersen LLP
7    3150 Porter Drive
     Palo Alto, CA 94304
8    650-849-4400
     650-849-4800 FAX
9

Harry LeVine
Conservation and Liquidation Office
California Department of Insurance
415 Market Street, 23rd Floor
San Francisco, CA 94105
415-538-4109
415-676-5001 FAX

10   Bryan Daly
     Marc Harris
     Beck, DeCorso, Daly & Kreindler
11   601 West Fifth Street, 12th Floor
     Los Angeles, CA 90071-2025
12

Stan G. Roman
Kreig, Keller, Sloan, Reilley & Roman
114 Sansome Street, 7th Floor
San Francisco, CA 94104

13   Lionel Aeschlimann
     Brunschwig Wittmer
14   10 Cours De Rive
     P.O. Box 3054
15   Ch-1211 Geneva 3
     Switzerland
16

17

18

19

20

21

22

23

24

25

26

27

28

SHARTSIS, FRIESE & GINSBURG LLP
EIGHTEENTH FLOOR
ONE MARITIME PLAZA
SAN FRANCISCO, CALIFORNIA 94111

-3-

Case No. CV 01-8587
(AHM) (CWx)                          PROOF OF SERVICE

BILL LOCKYER, Attorney General of California
CHRISTOPHER M. AMES, Senior Assistant Attorney General
RANDY BARROW (SBN 111290), Deputy Attorney General
1300 I Street, P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 322-1642
Facsimile: (916) 323-6882

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| State of California, *ex rel.* RoNo, LLC | CASE NUMBER |
|---|---|
| PLAINTIFF(S), | 01-8587 AHM (CWx) |
| v. | |
| Altus Finance S.A.; Apollo Advisors, L.P.; Artemis S.A.; Artemis Finance S.N.C. *(Continued)* | SUMMONS |
| DEFENDANT(S). | |

TO: THE ABOVE-NAMED DEFENDANT(S):

YOU ARE HEREBY SUMMONED and required to file with this court and serve upon plaintiff's attorney
<u>RANDY BARROW, Deputy Attorney General of California</u>, whose address is:

1300 I Street, P.O. Box 944255
Sacramento, CA 94244-2550

An answer to the ___ **COMPLAINT**, _X_ <u>FIRST</u> **AMENDED COMPLAINT**,
(1st, 2nd, etc.)
___ **COUNTERCLAIM**, ___ **CROSS-CLAIM** which is herewith served upon you within <u>20</u> days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

CLERK, U.S. DISTRICT COURT

DATE: JAN 3 0 2002

By _____
Deputy Clerk

*(SEAL OF THE COURT)*

# ATTACHMENT TO SUMMONS

### Defendants – *continued*

Artemis America Partnership; Aurora S.A.; Aurora National Life Assurance Company; Leon D. Black; Craig M. Cogut; CDR Enterprises; CDR Creances; Consortium De Realisation S.A.; Credit Lyonnais S.A.; Credit Lyonnais U.S.A.; Credit Lyonnais Securities, Inc.; John J. Hannan; Jean-Francois Henin; Lion Advisors, L.P.; MAAF Assurances; MAAF Vie S.A.; New California Life Holdings, Inc.; Omnium Geneve S.A.; Pegasus Insurance Partners, L.L.P.; Francois Pinault and Eric B. Siegel

MJS\6130\001\1175251.01

